**AUDIO INVESTMENTS, an Irrevocable Trust,
Plaintiff,**

v.

**Dewey L. ROBERTSON, Sr., Defendant and Third–Party Plaintiff,**

v.

**Roger Davenport, a/k/a Roger–Orme: Davenport; and the United States of America, Third–Party Defendants.**

**No. 8:002847–20BG.**

United States District Court,
D. South Carolina,
Greenwood Division.

April 19, 2002.

Orin Gail Briggs, Briggs and Cox, Lexington, SC, for Plaintiff.

James O. Spence, Dooley Dooley Spence Parker and Hipp, Lexington, SC, for Defendant.

Roger Davenport, Leesville, SC, Pro se.

Scott N. Schools, Asst. U.S. Atty., U.S. Attorneys Office, Charleston, SC, James D. McCoy, III, U.S. Attorneys Office, Greenville, SC, Brian Kaufman, Marc J. Korab, Maggie O'Shaughnessy, U.S. Department of Justice Tax Division, Washington, DC, for Third–party Defendants.

### ORDER

HERLONG, District Judge.

This matter is before the court with the Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b) and Local Rule 73.02 DSC.[1] Several motions are pending in the case. On January 25, 2002, United States Magistrate Judge George C. Kosko issued a Report and Recommendation which recommends, *inter alia*, granting the United States of America's ("Government") motion for summary judgment. After receiving extensions on the time to file objections, Roger Davenport ("Davenport"), proceeding *pro se*, filed a multitude of objections, most of which are untimely. Audio Investments, an Irrevocable Trust ("Audio Investments"), also filed objections. The Government responded to Davenport's and to Audio Investments's objections. After a *de novo* review of the case, the court grants the Government's motion for summary judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This dispute centers around Davenport's failure to pay federal income taxes and the Internal Revenue Service's ("IRS") subsequent seizure of his house. On July 22, 1985, Davenport and his wife, Marie Davenport, purchased lakefront property in Saluda County, South Carolina for $22,000.00 ("Saluda Property"). (Gov't M. Summ. J. Ex. 8.) During the years 1993 through 1996, the Saluda Property purportedly changed hands several times. Davenport executed two deeds attempting to transfer his interest in the Saluda Property to his daughter, Faith Davenport, for $10.00. (*Id.* Ex. 9, 11.) On March 28,

---

1. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. *See Mathews v. Weber,* 423 U.S. 261, 270, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

1994, Margaret Davenport attempted to transfer her interest in the Saluda Property to Faith Davenport, also for $10.00. (*Id.* Ex. 10.) On June 10, 1996, Faith Davenport attempted to transfer her interest in the Saluda Property to Audio Investments. (*Id.* Ex. 12.)

Davenport failed to file federal income taxes for the years 1991 through 1993, despite earning an adjusted gross income of over $100,000.00 in 1991 and 1992, and over $50,000.00 in 1993. (*Id.*, Ex. 1, 2 at ¶ 2.) On February 13, 1995, the IRS made an assessment of $33,534.00 in taxes plus $3,245.04 in interest for unpaid taxes due for 1991. (*Id.* Ex. 1.) On July 3, 1995, the IRS made an assessment of $34,111.00 in taxes plus $8,020.41 in interest for taxes due in 1992. (*Id.*) On February 12, 1996, the IRS made an assessment of $11,338.00 in taxes plus $2,467.03 in interest for taxes due in 1993. (*Id.*)

On March 21, 1996, and April 10, 1996, the IRS filed notices of federal tax liens for the tax years 1991, 1992, and 1993 in Saluda County against Davenport. (*Id.* Ex. 3, 4.) On August 26, 1996, the IRS issued notices of its intent to levy to Davenport. (*Id.* Ex. 19, 20.) On October 24, 1997, the IRS filed a notice of federal tax lien in Saluda County against Audio Investments, as the alter ego of Roger Orme Davenport. (*Id.* Ex. 7.) On February 9, 1998, the IRS levied on the assets owned by Davenport. (*Id.* Ex. 21.) Finally, on March 16, 1998, the IRS seized the Saluda Property. (*Id.* Ex. 2.)

Following the seizure of the Saluda Property, the IRS issued notices of sale. (*Id.* Ex. 22–27.) On May 29, 1998, the IRS sold the property to Dewey L. Robertson, Sr. ("Robertson") for $110,000.00. (*Id.* Ex. 31.) The IRS issued Robertson a deed on December 7, 1998. (*Id.* Ex. 2.)

Audio Investments originally filed this case in state court against Robertson as an action to quiet title. Robertson filed an amended answer and a third-party complaint naming Davenport and the Government as third-party defendants. On September 13, 2000, the Government removed the case. Currently pending before the court are the following motions: (1) Audio Investments' motion to certify a question of law to the South Carolina Supreme Court; (2) Audio Investments' motion to deny the claim of privilege as to a memo to counsel; (3) Audio Investments' motion for partial summary judgment; (4) the Government's motion for summary judgment, and in the alternative, to dismiss for lack of jurisdiction; and (5) Davenport's motion to remand.

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are

irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505. Moreover, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

## B. The Government's Motion for Summary Judgment

In its motion for summary judgment, the Government asks the court to determine whether the IRS properly seized the Saluda Property and whether Robertson holds legal title to the Saluda Property. To decide this question, the court must resolve two main issues. First, the court must decide whether persons or entities other than Davenport held any real interest in the Saluda Property. Second, the court must determine whether the IRS complied with the applicable law in seizing the Saluda property.

### 1. Fraudulent Conveyances

The Government contends that Davenport's conveyances of the Saluda Property were fraudulent and that Audio Investments is simply his alter ego. Audio Investments and Davenport contend that the IRS wrongfully seized the Saluda Property to satisfy Davenport's tax obligations because Davenport had no interest in the property—the Saluda Property belonged to Audio Investments.

Assuming it exists at all, Audio Investments is a curious creature. On June 19, 1992, a "Contract and Declaration of Trust" was filed in Maricopa County, Arizona. (Gov't M. Summ. J. Ex. 14.) The front page of the document states, "This Declaration of a Pure Trust Organization Authorizes Its Trustees to Operate Under

the Name of AUDIO INVESTMENTS." (*Id.*) The document designates John Michael Crim of Bernalillo County, New Mexico as the "Creator" of the trust and P.R. Houtz, also of Bernalillo County, as the trust's "Exchangor." (*Id.*) Ray A. Young and Steven E. Duke, both of Bernalillo County, are listed as the "First Trustee" and "Second Trustee," respectively. The "Successor Trustee" is Dana T. Houtz. (*Id.*)

Audio Investments purportedly held title to the Saluda Property through a series of conveyances by members of the Davenport family. Each of these conveyances was made for nominal consideration—$10.00. Davenport testified that he owns no assets and does not keep a bank account in his own name. (Davenport Depo. at 30.) Davenport initiated the transactions eventually leading to Audio Investments' possession of the Saluda Property on September 23, 1993, by executing the first deed to his daughter. (Gov't M. Summ. J. Ex. 9.) By that time, Davenport certainly was on notice that he failed to pay his income taxes. (Davenport Depo. at 35.) Therefore, these transfers rendered Davenport insolvent at a time when he also was indebted to the United States for unpaid income taxes.

■ Under South Carolina law, such a conveyance is a nullity. South Carolina's Statute of Elizabeth, which invalidates fraudulent conveyances such as those made by Davenport, states:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands . . . by writing or otherwise . . . made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or

their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

S.C.Code Ann. § 27–23–10(A).[2]

South Carolina law first distinguishes between existing creditors and subsequent creditors. *See Mathis v. Burton,* 319 S.C. 261, 460 S.E.2d 406, 408 (1995). Because Davenport's debt accrued during the years he failed to pay his taxes, even though the precise amount of his debt had not been computed to a precise figure, the court finds that there can be no question that the IRS was an existing creditor at the time Davenport transferred his property.

South Carolina then distinguishes between transfers made without valuable consideration versus transfers made for valuable, but grossly inadequate consideration. *See Royal Z Lanes, Inc. v. Collins Holding Corp.,* 337 S.C. 592, 524 S.E.2d 621, 622 (1999). If a transfer was made for grossly inadequate consideration, "a transfer may be set aside as a fraudulent conveyance only if there is an actual intent to defraud creditors imputable to the grantee." *Id.* "A transfer made *without* valuable consideration, however, may be set aside even without an actual intent to defraud." *Id.* (emphasis in the original). "Under § 27–23–10, a transfer made without valuable consideration will be set aside as a fraudulent conveyance if the grantor was indebted to the plaintiff at the time of

the transfer and the grantor failed to retain sufficient property to pay his debt to the plaintiff, not merely at the time of transfer, but at the time the plaintiff seeks to collect." *Future Group II v. Nationsbank,* 324 S.C. 89, 478 S.E.2d 45, 48 (1996). Under this test, there is no genuine issue of material fact and the court finds that Davenport's conveyance of the Saluda Property was fraudulent under section 27–23–10 and is therefore void.

Furthermore, the court finds that no genuine issue of material fact exists concerning the nature of Audio Investments. Audio Investments is a sham used by Davenport in an attempt to conceal assets from the IRS. Davenport's son and daughter, John and Faith Davenport, are the "managers" of the trust. (John Davenport, as Fed.R.Civ.P. 30(b)(6) designee of Audio Investments, Depo. at 11.) Audio Investments has no beneficiaries. (John Davenport Depo. at 29, 81.) While the trust document states that it holds property for the benefit of "certificate holders," it also states that the "Trust Organization" shall own both legal *and* equitable title to all property acquired. (Gov't M. Summ. J. Ex. 14.) The "certificate holders" do not have equitable title to the trust corpus. (John Davenport Depo. at 86.) Nor does there appear to be any purpose behind the trust except the holding of the Saluda Property. (John Davenport Depo. at 22, 25, 79–83.) John Davenport gave the following definition of a "pure trust" such as Audio Investments:

Pure Trust is not created under any statutory authority, it does not have any adhesion contracts with federal or state government. It operates under common law as guaranteed by the Constitution of the United States of America for the

---

**2.** The quoted passage is the current version of this statute. Section 27–23–10 was altered in 1997, but the statute's effect and operation have not changed.

states. It enjoys the rights that a person enjoys as guaranteed under the Constitution of the United States of America and the fifty states.

(John Davenport Depo. at 25–26.) Also, according to John Davenport's definition, a "pure trust" does not have federal tax obligations. (John Davenport Depo. at 26.)

■ Without a beneficiary or a purpose, Audio Investments is not a trust under either Arizona or South Carolina law. *See Golleher v. Horton*, 148 Ariz. 537, 715 P.2d 1225, 1231 (1985) ("The essential elements of a trust are a competent settlor and a trustee, clear and unequivocal intent to create a trust, ascertainable trust res, and sufficiently identifiable beneficiaries."); *Williams v. Wilson*, 341 S.C. 136, 533 S.E.2d 593, 596 (2000) ("For a trust to exist certain elements must be present, including a declaration creating the trust, a trust *res*, and designated beneficiaries").[3]

Furthermore, the operation of Audio Investments shows that it is a nullity. John Davenport stated that Audio Investments' purpose was "asset protection." (John Davenport Depo. at 11, 22.) Even though he is the "manager" for the trust, John Davenport does not have signatory authority on the trust's bank account. (John Davenport Depo. at 15–16.) John Davenport testified that Audio Investments owns the Saluda Property as a rental property, and that his parents rent the property from the trust. (John Davenport Depo. at 65–68.) However, the lease states that the rent is either $800 per month or forty hours per week of sweat equity. (Gov't M. Summ. J. Ex. 16.) Davenport has never paid the rent in monetary form and supposedly kept a log of the work he did on

the property for review by the trust. (John Davenport Depo. at 68.) Based on these facts, the court finds that there is no genuine issue of material fact and the court finds that Audio Investments is a non-entity and is simply the alter ego of Roger Davenport.

### 2. Seizure of the Saluda Property by the IRS

The court finds that there is no genuine issue of material fact and the IRS complied with the procedures necessary to seize the Saluda Property for Davenport's failure to pay income taxes. As recounted above, *supra* part I, the Certificate of Assessments and Payments submitted by the Government shows that the proper procedures were followed.

■ It is undisputed that Roger Davenport did not file income tax returns for 1991, 1992, or 1993. (Roger Davenport Depo. at 35.) The Certificate of Assessments and Payments shows the dates on which substitute returns were generated, assessments were made and noticed, and the date the liens were noticed. (Gov't M. Summ. J. Ex. 1.); *See United States v. Dixon*, 672 F.Supp. 503, 506 (M.D.Ala. 1987) (stating that Certificate of Assessments and Payments is presumptive proof of a valid assessment). The presumption of official regularity also applies to the IRS's mailing of a notice of deficiency to Davenport, especially considering the absence of any *clear* proof to the contrary. *See id.* at 506–07. Notices of levy were sent to Davenport. (Gov't M. Summ. J. Ex. 19–21; Roger Davenport Depo. at 42, 53.) In fact, Roger Davenport admits that he received notices from the IRS "on a regular basis." (Roger Davenport Depo.

---

**3.** The court also notes the decisions of other courts dealing skeptically with "pure trusts." *See, e.g., Bracken v. Earl,* 40 S.W.3d 499 (Tenn.Ct.App.2000); *Barmes v. Commissioner,* 81 T.C.M. (CCH) 1825, 2001 WL 732879 (2001); *Neve v. Commissioner,* 1981 WL 10827 (1981).

at 45.) The Certificate of Assessments and Payments, in addition to Davenport's testimony that he received notices from the IRS, is sufficient to show that the IRS properly issued Davenport notice of his federal tax liability and the IRS's intent to seize his property. *See Dixon*, 672 F.Supp. at 506, (Carol Blount Depo. at 62–64.) Davenport's argument that the IRS was required to send notices to Audio Investments is irrelevant because, as stated earlier, Audio Investments is merely a sham. Furthermore, the documents submitted by the Government show that IRS followed proper procedures in the sale of the Saluda Property. (Gov't M. Summ. J. Ex. 22–32.)

■ Nor is the seizure of Margaret Davenport's alleged half-interest in the property relevant here. First, Margaret Davenport is not a party to this litigation. Second, the Internal Revenue Code provides an action for wrongful levy. *See* 26 U.S.C. § 7426(a)(1). Margaret Davenport failed to bring such an action within the nine-month statute of limitations. *See* 26 U.S.C. 6532(c)(1). The same analysis applies to any contention that Faith Davenport retains an interest in the property. Therefore, the court finds that there is no genuine issue of material fact that the IRS rightfully seized and sold the Saluda Property and that title to the Saluda Property passed to Robertson when the IRS sold it to him on December 7, 1998.

### C. Other Pending Motions

The court has reviewed the remaining pending motions filed by Davenport and Audio Investments. After review, and in light of its ruling on the Government's motion for summary judgment, the court finds these motions wholly without merit. Therefore, these motions are denied.

Therefore, it is

**ORDERED** that the Government's motion for summary judgment is granted. It is further

**ORDERED** that Audio Investments and Davenport's motions are denied.

**IT IS SO ORDERED.**

### NOTICE OF RIGHT TO APPEAL

Petitioner is hereby notified that he has the right to appeal this order within sixty days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.

### SUMMARY JUDGMENT IN A CIVIL CASE

**Decision by the Court.** This action came to hearing before the court. The court having adopted the report and recommendation of the magistrate judge granting the defendants' motion for summary judgment,

IT IS ORDERED AND ADJUDGED that summary judgment is hereby entered as to the defendant United States of America.

### Report and Recommendation

KOSKO, United States Magistrate Judge.

The above-captioned case is before the undersigned United States Magistrate Judge for a Report and Recommendation. The above-captioned case originated as a quiet title action in the Court of Common Pleas for Saluda County (Case No. 99–CP–41–125).

The seeds of this civil action were sown by Roger O. Davenport, for the record amply demonstrates that Roger O. Davenport initiated on September 23, 1993, the first step in a series of fraudulent transfers to conceal assets from the Internal Revenue Service (hereinafter the "Service"), and attempted to place assets beyond the reach of federal taxation au-

thorities. The above-captioned case is illustrative of consequences (whether intended or unintended) resulting from the activities of self-deluded tax protesters.[1]

Roger O. Davenport is proceeding *pro se* and has been apprised of dispositive motion procedure. *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir.1975)(district court must advise a plaintiff confronted by a dispositive motion from an adverse party of his or her right to file counter-affidavits or other responsive material, and be alerted to the fact that his or her failure to so respond might result in the entry of summary judgment against him or her).

The relevant history of the above-captioned case can be redacted into several events (or, as it were, "causes and effects"). The events cover approximately a fifteen-year period:

| | |
|---|---|
| July 22, 1985 | Roger and Margaret Davenport purchase property for $22,000, and deed is properly recorded. *See* Government's Exhibit 8. |
| April 15, 1992 | Roger Davenport fails to file Federal Income Tax Return for Calendar Year 1991 |
| June 19, 1992 | Audio Investments "Trust" filed in Maricopa County, Arizona. *See* Government's Exhibit 14. |
| April 15, 1993 | Roger Davenport fails to file Federal Income Tax Return for Calendar Year 1992 |
| September 23, 1993 | Roger Davenport, purportedly, executes transfer of his interest in property to Faith Davenport (his daughter) for Ten Dollars ($10). *See* Government's Exhibit 9. |

1. *See* James Edward Maule, *Instant Replay, Weak Teams, and Disputed Calls: An Empirical Study of Alleged Tax Court Judge Bias*, 66 Tenn. L.Rev. 351 (Winter 1999), where the study concluded that tax protesters tended to rely, to their detriment, on discredited arguments before the United States Tax Court:

> * * * [E]xamination of the issues provides a rational, coherent, and sensible explanation for the overwhelming rate of IRS success. Essentially, to return to the sporting metaphors, trying to use these issues to evaluate the referee's impartiality is much like blaming the umpires of a pro-am softball series for the lopsided margins of victory posted by the almost undefeated professionals. Simply put, on these issues, the taxpayers are almost always out of their league. They take positions in direct conflict with the statute or regulations, they fail to introduce evidence, they fail to appear, they rely on boilerplate tax protester cliches, and they otherwise manifest a lack of understanding or comprehension of the demands of litigation.
>
> Even though there was virtually no difference between the regular and memorandum decisions in terms of bias opportunity, there is a noticeable difference between the taxpayers' 3% success rate in memorandum opinions and 24% success rate in regular opinions. The surprise is not so much the 3% rate but the 24% rate. There are several possible explanations for the difference, but the most striking is the ever-increasing number of pro se taxpayer litigants, * * * particularly in cases that are the subject of a memorandum opinion. Ninth-inning heroics can be expected from some of the taxpayer attorneys arguing issues destined for resolution in a regular opinion but are hardly expected from pro se taxpayers, whose tax training and knowledge of legal processes pales in comparison both to the professionally educated Chief Counsel attorney representing the IRS and to the similarly educated, and probably more experienced, attorney representing taxpayers with genuinely pursued disputes. * * * The judges attempt to assist pro se taxpayers because the absence of trained attorneys prevents some issues of first impression from being adequately argued and briefed. Many of the pro se taxpayers, however, either reject the help, as is the case with protesters, * * * or insist on proceeding in their own way despite the judge's suggestions. In contrast, the IRS does not, and has no reason to, engage in a practice of failing to appear in court, pursuing hopeless cases, and ignoring legal precedent.

| | |
|---|---|
| October 18, 1993 | Pursuant to 26 U.S.C. (I.R.C.) § 6020(b), the Service prepares Substitute Return for Calendar Year 1992 for Roger Davenport |
| March 28, 1994 | Margaret Davenport, purportedly, executes transfer of her interest in property to Faith Davenport (her daughter) for Ten Dollars ($10). *See* Government's Exhibit 10. |
| April 11, 1994 | Pursuant to 26 U.S.C. (I.R.C.) § 6020(b), the Service prepares Substitute Return for Calendar Year 1991 for Roger Davenport |
| April 15, 1994 | Roger Davenport fails to file Federal Income Tax Return for Calendar Year 1993 |
| February 13, 1995 | Service makes assessment against Roger Davenport for unpaid Calendar Year 1991 federal income taxes of $33,534. |
| June 19, 1995 | Pursuant to 26 U.S.C. (I.R.C.) § 6020(b), the Service prepares Substitute Return for Calendar Year 1993 for Roger Davenport |
| July 3, 1995 | Service makes assessment against Roger Davenport for unpaid Calendar Year 1992 federal income taxes of $34,111 |
| October 23, 1995 | Notice of Federal Tax Liens against Roger Davenport for 1991 and 1992 Federal Income Taxes filed in Lexington County |
| February 12, 1996 | Service makes assessment against Roger Davenport for unpaid Calendar Year 1993 federal income taxes of $11,338. |
| March 21, 1996 | Notices of Federal Tax Liens against Roger Davenport for 1993 Federal Income Taxes filed in Saluda County and in Lexington County |
| April 10, 1996 | Notice of Federal Tax Liens against Roger Davenport for 1991 and 1992 Federal Income Taxes filed in Saluda County |
| June 10, 1996 | Faith Davenport, purportedly, executes deed transferring property to Audio Investments for $10 |
| 1996 | Notices of Intention to Levy for 1991, 1992, and 1993 taxes issued |
| October 27, 1997 | Notice of Federal Tax Lien filed against Audio Investments for Roger Davenport's 1991, 1992, and 1993 federal income taxes |
| February 9, 1998 | Service levies against assets of Roger Davenport |
| March 16, 1998 | Service seizes property (mailing address of Route 2, Box 340–D, Leesville, South Carolina 29070) |
| April–May, 1998 | Notices of Sale of property issued |
| May 29, 1998 | Service sells property to Dewey L. Robertson, Sr. for $110,000. |
| May 29, 1998 | Six-month period for redemption of property commences under 26 U.S.C. (I.R.C.) § 6338(a) commences |
| November 30, 1998 | Six-month period for redemption of property expires (because November 29, 1998 fell on a Sunday) |
| December 7, 1998 | Service issues deed for property to Dewey L. Robertson, Sr. |
| December 21, 1998 | Deed from Service to Dewey Robertson, Sr., is recorded at Deed Book 427, page 332–335, |
| December 30, 1998 | Addendum ("Additional Page") to Deed from Service to Dewey Robertson, Sr., recorded |
| September 23, 1999 | Audio Investments, through counsel, Orin G. Briggs, issues summons to Dewey L. Robertson in quiet title action |
| October 4, 1999 | Audio Investments, through counsel, Orin G. Briggs, formally files quiet title action in Court of Common Pleas for Saluda County (Case No. 99–CP–41–125) |
| October 7, 1999 | Audio Investments, through counsel, Orin G. Briggs, files summons in Clerk of Court for Saluda County |
| November 4, 1999 | Dewey Robertson, through counsel, James O. Spence, files amended answer with affirmative defenses |

| August or September, 2000 | Counsel for Dewey Robertson formally files motion to add United States of America, by the through the Internal Revenue Service and Roger Davenport as parties to state court action |
| --- | --- |
| September 13, 2000 | United States removes case to federal court |

It can be inferred from the history of this case that, between 1985 and 1991, Roger O. Davenport got himself, as it were, "mixed up" with tax protester organizations or persons. In a manner similar to what often befalls persons who become addicted to gambling, alcoholic beverages, or illegal drugs, Roger Davenport commenced a series of fraudulent acts that resulted in the loss of his home.

Various motions and cross motions have been filed by the parties. Currently pending before the court are: Roger Davenport's motion to remand action to state court (Document No. 19); Audio Investments' Motion to Remand to State Court (Document No. 16); Audio Investments' Motion to Certify Question (Document No. 56); Audio Investments' Motion to Deny Claim of Privilege (Document No. 58); Audio Investments' Motion for Partial Summary Judgment (Document No. 70); the Motion for Summary Judgment or, in alternative, Motion to Dismiss filed by the United States (Document No. 76).[2]

**2.** Roger Davenport may be relying on literature and tactics recommended by militias, "sovereign" groups, and tax-protester groups. *See* Tanya Telfair Sharpe, *The Identity Christian Movement: Ideology of Domestic Terrorism,* 30 Journal of Black Studies Issue 4 (March 1, 2000)("Identity Christian organizations promote their causes with a variety of literature and other media strategies. The Jubilee, published by Paul Hall, is the country's leading Identity periodical. The American's Bulletin is another popular source for Identity rhetoric and is produced by Robert Kelly of Medford, Oregon. There are many other books, tracts, and audio- and videotapes that provide followers with reinforcement for their beliefs (False Patriots, 1996)."), *reprinted at* 2000 WESTLAW® 12727206. *See also, e.g.,* Michael Fechter, *Church Tied to Anti–Government Organizations,* Tampa Tribune, March 28, 1998 ("The American's Bulletin is 'very much within the patriot movement in a big way. It is full of New World Order conspiracy theories,' said Mark Potok, editor of the Intelligence Report. The report is published by the Southern Poverty Law Center as a monitor on militant right-wing political groups."), *reprinted at* 1998 WESTLAW® 2770097.

It is not clear from the secondary literature how the "Identity Christian" organizations and tax protester organizations are linked. The link between two such groups may be oxymoronic. *See* Mary Jo Newborn Wiggins, *A Statute of Disbelief?: Clashing Ethical Imperatives in Fraudulent Transfer Law,* 48 S.C.L.Rev. 771 (Spring 1997)("A person could heed Romans 13:6–7 wherein the Apostle Paul states, 'For because of this you also pay taxes, for they are God's ministers attending continually to this very thing. Render therefore to all their due, customs to whom customs,. fear to whom fear, honor to. whom honor.'"). *See also 3000 Quotations from Matthew Henry* (Compilor: William T. Summers; © 1982 Fleming H. Revell, Grand Rapids, Michigan), quoting the seventeenth-eighteenth century Bible commentator, Matthew Henry (1644–1714), on Romans 13: "What we have we have as stewards; others have an interest in it, and must have their dues. * * * Render to all their dues; and that readily and cheerfully, not tarrying till you are by law compelled to it."

The use of a hyphen or colon (the punctuation mark) in names is typical of tax-protester and militia groups. Unfortunately, many such groups have their own websites and are establishing their own purported courts. In fact, the Supreme Court of South Carolina cautioned state employees and officials to be on the lookout for "documents" purportedly issued by such entities. *See Nash v. McIntosh,* 328 S.C. 76, 492 S.E.2d 75 (1997):

Petitioner has filed a petition with this Court seeking a writ of mandamus to compel the clerk of the circuit court to accept a document for filing. This document, which was issued by the Superior Court of the District of Columbia, allows a "judgment" issued by "Our One Supreme Court, Com-

The United States cites South Carolina case law on what is commonly known as the Statute of Elizabeth, § 27–23–10, South Carolina Code of Laws. The law is called the Statute of Elizabeth because the original version of the law enacted in England (now part of the United Kingdom of Great Britain and Northern Ireland) was enacted during the reign of Queen Elizabeth I. At the relevant times in this case (*i.e.*, prior to the General Assembly's 1997 amendments), South Carolina's Statute of Elizabeth provided:

§ 27–23–10. Conveyances to defraud creditors are void.

Every feoffment, gift, grant, alienation, bargain and conveyance of lands, tenements or hereditaments, goods and chattels, or of any of them, or of any lease, rent, commons or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment and execution which may be had or made to or for any intent or purpose to delay, hinder or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties and forfeitures shall be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every of them, whose actions, suits, debts, accounts, damages, penalties and forfeitures by such guileful, covinous or fraudulent devices and practices, as is aforesaid, are, shall or might be in any ways disturbed, hindered, delayed or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

HISTORY: 1962 Code § 57–301; 1952 Code § 57–301; 1942 Code § 8696; 1932 Code § 8696; Civ. C. '22 § 5218; Civ. C. '12 § 3455; Civ. C. '02 § 2369; G.S. 1786; R.S. 1888; 1712(2) 697.

Section 27–23–10, South Carolina Code of Laws.

mon Law Venue, Original and Exclusive Jurisdiction" in Franklin, North Carolina, to be filed as a foreign judgment in the District of Columbia, and indicates that the judgment of "Our One Supreme Court" is entitled to the same force and effect as a judgment issued in the District of Columbia. Petitioner argues that this State must accept this document for filing under the full faith and credit clause of the United States Constitution. U.S. CONST. art. IV, § 1.

On October 6, 1997, the Superior Court of the District of Columbia issued an order vacating the filing of the judgment of "Our One Supreme Court" nunc pro tunc to the date of its filing with that court. The Superior Court found that the judgment of "Our One Supreme Court" is not entitled to full faith and credit under either the Constitution of the United States or the law of the District of Columbia. [FN1] This renders petitioner's request for a writ of mandamus moot and the petition is denied.

[FN1. "Our One Supreme Court" is a body established by persons who are apparently dissatisfied with the legitimate judicial systems in this country. These persons believe that they have the authority to create their own courts.]

This view is, of course, preposterous since a court can only be created by the sovereign power of a state or the federal government. 21 C.J.S. Courts § 93 (1990). Accordingly, the actions and judgments of "Our One Supreme Court" and other similar bodies are a complete and utter nullity, and have no force or effect. In light of this, this Court has previously directed the clerks of court in this State not to accept any judgments or other documents which have been issued by "Our One Supreme Court." We take this opportunity to reemphasize this point.

*Nash v. McIntosh,* 492 S.E.2d at 76.

The United States Attorney for the District of South Carolina has removed another civil action concerning Roger Davenport to federal court. *See* pleadings in *Roger-Orme Davenport v. Federal Tax Lien, et al.,* Civil Action No. 3:02–0183–20BG, which was removed to federal court on January 18, 2002.

In 1712, the colonial Legislature of the Province of South Carolina determined which English statutes would be in effect in South Carolina. The various laws enacted by the colonial Legislature of South Carolina are commonly referred to as the Reception Acts. Hence, the "history" section of the Statute of Elizabeth reveals that South Carolina had a "pristine" version of the Statute of Elizabeth during the relevant times in this case.[3]

It is readily apparent that Roger Davenport's real estate transactions were suffi-ciently structured to call into question the Service's contention that Audio Investments is the alter ego of Roger Davenport. In other words, since Roger Davenport was not the "settlor" of the trust establishing Audio Investments in Arizona, it, facially, would be more difficult for the Service to assert that Audio Investments is Roger Davenport's alter ago. Even so, the documentary evidence in the above-captioned case reveals that Audio Investments, though formally established by persons other than Roger Davenport or his immediate family, was an entity or conduit

**3.** The General Assembly of the State of South Carolina revised the Statute of Elizabeth in 1997 to address the growing problem of fraudulent conveyances made to avoid the payment of court-ordered child support. The Statute of Elizabeth in South Carolina currently reads as follows:

§ 27–23–10. Conveyances to defraud creditors; transfers of income and property to avoid paying child support.

(A) Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them, or of any lease, rent, commons, or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, and execution which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

(B) A showing of two or more of the following creates a rebuttable presumption that a child support debtor intended to transfer income or property to avoid payment to a child support creditor:

(1) a close relationship between the transferor and transferee;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was not disclosed or was concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was substantially all of the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or after a substantial debt was incurred; and
(11) there was a departure from the usual method of business.

HISTORY: 1962 Code § 57–301; 1952 Code § 57–301; 1942 Code § 8696; 1932 Code § 8696; Civ. C. '22 § 5218; Civ. C. '12 § 3455; Civ. C. '02 § 2369; G.S. 1786; R.S. 1888; 1712(2) 697.

HISTORY: Amended by 1997 Act No. 71, § 40, eff June 10, 1997.

Section 27–23–10, South Carolina Code of Laws (as amended). The "old" Statute of Elizabeth has been recodified as Section 27–23–10(A) and the new child support measure has been codified as Section 27–23–10(B).

used by Roger Davenport in his effort to conceal assets from the Service to avoid paying lawfully imposed federal income taxes.

The scheme used by Roger Davenport might well be characterized as an ill-fated attempt to create a domestic or homespun version of a "Dahlstrom-type" trust over property located in South Carolina. *United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir.1983)(defendants charged and convicted for violating I.R.C. Section 7206(2) for their role in promoting abusive tax shelters; convictions reversed on appeal), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984).

*Dahlstrom* was a criminal case, not a civil case. Moreover, *Dahlstrom* is not binding in the Fourth Judicial Circuit. Decisions of Circuit Courts of Appeals are not binding outside their own circuits. *See Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379 (4th Cir.2001)(refusing to extend invalidation of FEC regulation outside the Fourth Judicial Circuit, and noting that intercircuit conflicts do not freeze the development of the law and give the Supreme Court of the United States the "benefit of decisions from several courts of appeals").

The United States correctly points out that the Service is not bound by the taxpayer's characterization of the transaction, and cites *Higgins v. Smith*, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406 (1940). Both the Tax Court of the United States and "Article III" courts have held, in cases over the past twenty years, that pure trusts and family trusts are sham transactions. *See, e.g., William L. Comer Family Equity Trust v. United States*, 732 F.Supp. 755 (E.D.Mich.1990), *affirmed, William L. Comer Family Equity Pure Trust v. Internal Revenue Service*, 966 F.2d 1455 (6th Cir.1992), *cert. denied, William Comer Eq-uity Pure Trust v. Internal Revenue Service*, 506 U.S. 1023, 113 S.Ct. 661, 121 L.Ed.2d 586 (1992); and *Estate of Yeoham v. Commissioner*, 1986 T.C.Memo 1986–431, 1986 WL 21641 (1986)("Labels, semantic technicalities, and formal documents do not necessarily control the tax consequences of a given transaction. Instead, we must be concerned with the economic realities and not the form employed by the parties."), *affirmed*, 826 F.2d 11 (5th Cir.1987)[Table]; *Zmuda v. Commissioner*, 79 T.C. 714, 1982 WL 11177 (1982), *affirmed*, 731 F.2d 1417 (9th Cir.1984); and *Professional Services v. Commissioner*, 79 T.C. 888, 1982 WL 11195 (1982). *See also* Joel C. Dobris, *Changes in the Role and the Form of the Trust at the New Millennium, or, We Don't Have to Think of England Anymore*, 62 Albany L.Rev. 543 (1998)("There are also the tax protesters with their wacky trusts. * * * it is tempting to say that some people believe that the only thing a trust cannot do is cure disease."); and Christopher S. Jackson, *The Inane Gospel of Tax Protest: Resist Rendering unto Caesar–Whatever His Demands*, 32 Gonzaga L.Rev. 291 (1996–1997). *Cf. Twyne's Case*, 76 Eng. Rep. 809, 813 (K.B. 1601)(noting that there was a "trust between the parties, for the (debtor) possessed all, and used them as his proper goods, and fraud is always apparelled [*sic*] and clad with a trust, and a trust is the cover of fraud"), which is quoted in Mary Jo Newborn Wiggins, *A Statute of Disbelief?: Clashing Ethical Imperatives in Fraudulent Transfer Law*, 48 S.C. L.Rev. 771, n. 104 (Spring 1997).

Although the various transactions initiated by Roger Davenport will not protect his tax protester activities in a civil action, Roger Davenport does have one consolation: it appears that the six-year limitations period for a criminal case, such as under 18 U.S.C. § 371 (conspiracy to de-

fraud the United States) or other statutes, against him has expired. 26 U.S.C. § 6501. *I.e.*, Roger Davenport will not go to prison for his fraudulent conveyance in 1993.[4]

The United States correctly points out that, aside from the original purchase of the property in 1985, none of the Davenport family transactions concerning the property have documentary stamps. Bona fide real estate transactions, such as deeds, must be recorded in the Register of Deeds (formerly called the Register of Mesne Conveyance)[5] for the particular county.

One point of the United States is well taken: the lack of documentary stamps on the 1993, 1994, and 1996 conveyances. At the time the fraudulent conveyances were made, South Carolina had an extensive

documentary or stamp tax. *See* "old" § 12–21–310 and "old" § 12–21–380, South Carolina Code of Laws (1992 version of South Carolina Code of Laws).[6]

Many of the documentary taxes were repealed in 1996 and replaced with a "recording fee" based on the value of the property. *See* South Carolina Department of Revenue Information Letter No. 97–17 (August 14, 1997), *reported at* 1997 WEST-LAW® 900869; South Carolina Revenue Procedure 97–3 (February 24, 1997), *reported at* 1997 WESTLAW® 895303; and South Carolina Department of Revenue Information Letter No. 96–18 (August 19, 1996), *reported at* 1996 WESTLAW® 942502, at \*41–\*42.

The documentary evidence before the court confirms the Service's contention

---

4. Even so, it can be judicially noticed that the United States has criminally prosecuted tax protesters who have filed fraudulent liens against federal officials and employees. *See United States v. Bostian,* 59 F.3d 474, 476–480 (4th Cir.1995), *cert. denied, Bostian v. United States,* 516 U.S. 1121, 116 S.Ct. 929, 133 L.Ed.2d 857 (1996); and *United States v. MacElvain,* 858 F.Supp. 1096, 1100 (M.D.Ala. 1994)("The filing of such frivolous documents imposes irreparable harm on the individuals and entities that are the victims of the liens."), *affirmed,* 68 F.3d 486 (11th Cir.1995). The rationale of the tax protester cases indicates that United States District Courts must be vigilant in preventing the filing of fraudulent liens and other documents by tax protesters. *See United States v. Reeves,* 782 F.2d 1323 (5th Cir.), *cert. denied, Reeves v. United States,* 479 U.S. 837, 107 S.Ct. 136, 93 L.Ed.2d 79 (1986).

5. The General Assembly of the State of South Carolina in 1997 changed the title of a Register of Mesne Conveyance to Register of Deeds. 1997 S.C. Acts 34 (effective January 1, 1998).

6. The record before the court and the briefs filed by the parties do not disclose why no documentary stamps are on the 1993, 1994, and 1996 deeds. The 1992 amendments to § 12–21–380 set a documentary tax at the

rate of $1.30 for each $500 in consideration. *See* the South Carolina Tax Commission's Changes in Tax Laws (IL–92–25), *reported at* 1992 WESTLAW® 367376.

The undersigned, however, cannot rule out the possibility that the Office of the (then) Register of Mesne Conveyance for Saluda County failed to comply with "old" § 12–21–440, South Carolina Code of Laws (1991 version of 1976 Code). Although the prior version of the South Carolina Code of Laws contained a financial "penalty" provision for a failure by a Register of Mesne Conveyance to require payment of the documentary tax, *see* "old" § 12–21–450, there is no indication that the law has ever enforced or even cited. In other words, "old" § 12–21–450 may have been an unutilized statute. For a better example of an unutilized or underutilized statute, *cf.* § 10–11–10, South Carolina Code of Laws:

§ 10–11–10. Walking on roof of State House.

It shall be unlawful for any person, without the permission of the State Budget and Control Board or a member of that Board, to enter upon or walk upon the roof of the State House. Any person violating the provisions of this section shall be punished by a fine of not more than one hundred dollars or imprisoned for not more than thirty days on the public works of Richland County for each offense.

that the 1993 and 1994 conveyances from Roger Davenport and Margaret Davenport to Faith Davenport fall within the scope of the so-called Statute of Elizabeth. The Statute of Elizabeth in South Carolina is not limited to judgment creditors and no court judgment is needed to invoke it. *Lebovitz v. Mudd*, 293 S.C. 49, 358 S.E.2d 698 (1987), which is cited in *Future Group, II v. Nationsbank*, 324 S.C. 89, 478 S.E.2d 45, 50 (1996).

It can be judicially noticed that individual federal income tax returns for Calendar Year 1991 were due on Wednesday, April 15, 1992, unless an extension of time was sought. Roger Davenport did not file an individual federal income tax return for 1991 and did not seek an extension of time by filing a request for extension of time on or before April 15, 1992. Hence, on April 16, 1992, the Service became a creditor of Roger O. Davenport. In other words, the Service became a creditor of Roger Davenport at 12:01 A.M. on April 16, 1992 with respect to his 1991 federal income taxes.

At this point is appropriate to digress, slightly, and discuss footnote 1 of the Response of the United States (Document No. 79) to Plaintiff's Motion for Partial Summary Judgment. Mr. Marc J. Korab, the Attorney for the Tax Division of the United States Department of Justice, was obviously attempting to address the concerns expressed by the undersigned in pri-

or orders as to whether Roger and Margaret Davenport filed "joint" returns or "married filing separate" returns. After the United States' briefs were filed, this court became aware that no federal income returns had been filed for Calendar Years 1991, 1992, and 1993 by Margaret Davenport or Roger Davenport.[7]

A joint return must include all income, exemptions, and deductions of both spouses. Generally, both spouses are jointly and severally liable for the tax due on a joint return. Treasury Regulation § 1.6013–4(b).

■ Margaret Davenport's failure to file federal income tax returns for 1991–1993, irrespective of whether she was required to do so, means that she cannot avail herself of various "innocent spouse" provisions, whose time and financial provisions are triggered by the filing of a return. *See* "old" 26 U.S.C. (I.R.C.) § 6013, which was later superannuated by the 1998 Restructuring and Reform Act ("RRA"). Moreover, a married individual taxpayer (whether a tax protester or a person involved in a legitimate tax dispute with the Service) would, justifiably, cry "foul" if the Service were to calculate income taxes due on the basis of a "married filing separately" status. See, *e.g., Shea v. Commissioner*, 112 T.C. 183, 1999 WL 177471 (1999), *nonacq.*, 2000–44 I.R.B. 429.[8]

---

7. Yet, it must be noted that Government's Exhibit 1 (to Document No. 79), a computer-generated printout of IRS information (dated September 24, 2001) lists Roger Davenport's filing status for 1991, 1992, and 1993 as the following: " * *FILING STATUS: MARRIED FILING SEPARATE[.]" The double asterisk appears to refer to another notation: " * * PER RETURN AS ADJUSTED[.]"

8. In light of Margaret Davenport's conveyance of March 28, 1994, it is unlikely that she would be entitled to "innocent spouse" relief. *See R.D. Bokum v. Commissioner*, 1990 WL 17262 (U.S.Tax Ct., Feb. 28, 1991)(knowledge

of facts of transaction prohibits innocent spouse relief), *affirmed on other grounds*, 992 F.2d 1132 (11th Cir.1993). Since South Carolina is not a community property state and Margaret Davenport did not file a tax return under the filing status of "married filing separately," "old" 26 U.S.C. § 66(c) would not have been available to Margaret Davenport.

If a husband and wife file as married filing separately, each is liable only for the tax due on his or her own return. *See Edith Stokby v. Commissioner*, 1956 WL 725 (Tax Ct.1956), *acq.*, 1957–1 C.B. 5 and 1957–2 C.B. 7. If, in future tax years, a truly innocent spouse

The record before the court shows that Margaret and Roger Davenport have been married at all relevant times in this case and have lived together as married persons on the property in question. In light of the profound difference in the tax rates between "married filing jointly" and "married filing separately" during the tax years in question and continuing to the present day, the Service is probably correct in saying that "married filing jointly" is the correct filing status.[9]

Longstanding South Carolina case law on the Statute of Elizabeth provides that voluntary conveyances to family members will receive close scrutiny. The late Honorable Randall T. Bell, Judge of the South Carolina Court of Appeals, in an opinion upheld a trial court's finding that a conveyance from a debtor to another family member violated the Statute of Elizabeth:

First Citizens Bank commenced this action to set aside a voluntary conveyance from Joe W. Scofield, Jr., to his mother, Venita McCue Scofield. The Bank alleged the conveyance was to prevent it from collecting a judgment against Scofield for an unpaid indebtedness. The circuit court entered a decree setting aside the conveyance. The Scofields appeal. We affirm.

In January 1977, Scofield executed a promissory note to the Bank to cover certain business indebtedness. The note was renewed in January 1978. Scofield defaulted on the note in June 1979.

In August 1978, prior to his default on the note, Scofield conveyed his residence in Mount Pleasant to his mother. The mother paid nothing for the property. After the conveyance, Scofield continued to reside on the property and to pay the mortgage and taxes on it. He pays no rent to his mother. The mother continues to reside at her own home on James Island. She testified she knew nothing about the conveyance until it was completed.

The Bank obtained a judgment on the note in May 1980. In August 1980 an execution was issued on the judgment. The execution was returned nulla bona by the sheriff of Charleston County. Thereafter the Bank commenced this action to have the conveyance set aside.

We hold the conveyance from Scofield to his mother was void under the Statute of Elizabeth, now codified as Section 27-23-10, Code of Laws of South Carolina, 1976. One who is in debt cannot make a voluntary conveyance which will prevail against existing debts. *Cordery v. Zealy,* 1831 WL 1518, 18 S.C.L. (2 Bail.) 205 (1831); *Richardson v. Rhodus,* 1866 WL 2325, 48 S.C.L. (14 Rich.) 95 (1866). If the debt was in existence at the time of the conveyance, it is immaterial that it had not yet been reduced to judgment. *Matthews v. Montgomery,* 193 S.C. 118, 7 S.E.2d 841 (1940). A voluntary conveyance which has the effect of defeating the rights of existing creditors is not saved from the operation of the statute

wishes to protect himself or herself from the consequences of a spouse's tax protester activities, the innocent spouse should file a tax return under the filing status of "married filing separately."

In hindsight, it probably would have been better for Margaret Davenport not to have made the conveyance of March 28, 1994, to Faith Davenport. But for that transaction, the Service might have been required to com-

pensate Margaret Davenport under 26 U.S.C. § 7403.

9. Indeed, the tax rate differences between "married filing jointly" and "married filing separately" are so great that, as a practical matter, the "married filing separately" filing status is usually employed by spouses who are actually separated (but not legally separated) and who are not "on speaking terms" with one another.

by reciting a consideration of five dollars and "love and affection." *See Farmers' Bank v. Bradham,* 129 S.C. 270, 123 S.E. 835 (1924); *Coleman v. Daniel,* 261 S.C. 198, 199 S.E.2d 74 (1973).

The decree of the circuit court is AFFIRMED.

SANDERS, C.J., and SHAW, J., concur.

*First Citizens Bank and Trust Company v. Scofield,* 286 S.C. 520, 335 S.E.2d 248 (1985).

Although not cited by the United States, it can be judicially noticed that courts of the State of South Carolina have discountenanced conveyances of real estate designed to defraud creditors even if such fraudulent conveyances "worked" (*i.e.,* the creditor never learned of the fraudulent conveyances or the creditor was otherwise paid in full). *See All v. Prillaman,* 200 S.C. 279, 20 S.E.2d 741 (1942). In *All v. Prillaman,* a conveyance had been made to place property beyond the reach of a creditor during bad economic times. The grantee in *All v. Prillaman,* as it were, doubled-crossed the other family members, who brought suit against grantee in a Court of Common Pleas. The fraud was never brought to the attention of the creditor because the creditor was paid (thanks to the sale of a "gin lot"). Subsequently, the grantee "double-crossed" the other family members and kept the property. The Supreme Court of South Carolina refused to impose a parole trust on the property under the Statute of Frauds because the underlying conveyance had been designed to defraud creditors:

The testimony in this case to the effect that the parol understanding was that the appellant should save the parental home, if possible, for the family is not explained. It is susceptible of the inference that it was intended that the device of the conveyance would provide the escape of the property from the claims of creditors of Mrs. All who did not have mortgage liens upon it. If that was the object, she and her devisees cannot invoke the aid of equity to recover the property from the grantee, the appellant. "The resultant implied agreement, or trust, is the child of the law, and equity will support its existence and enforce its purposes. It seems but elementary to say that the law, in the exercise of its creative power, will not use the faulty material of fraudulent intent, or create a contractual structure which shelters its own masked enemy, fraud. Where the law does not attack, it will not consort with fraud, but will leave it alone." *Flesner v. Cooper,* 62 Okl. 263, 162 P. 1112, 1117 (1917). "Accordingly, a parol trust cannot be ingrafted upon a deed made for the purpose of hindering, delaying, or defrauding creditors. *Leland v. Chamberlin,* 56 Tex.Civ. App. 256, 120 S.W. 1040 (1909)." 35 A.L.R. 287.

To the same effect is *Jolly v. Graham,* 222 Ill. 550, 78 N.E. 919, 920 (1906), where it was said: "The law will not permit a party to deliberately put his property out of his control for a fraudulent purpose, and then, through intervention of a court of equity, regain the same after his fraudulent purpose has been accomplished." See also *Hornbeck v. Crawford,* 130 Or. 230, 279 P. 870 (1929), supra.

For the reasons above set forth it is our view that the Circuit Court erred in refusing appellant's motion for the direction of verdict and in granting that of respondents, and further that appellant is likewise entitled to judgment for the possession of the property described in the complaint and for judgment upon the counterclaim, for the entry of which the case is reversed and remanded to the Court of Common Pleas.

*All v. Prillaman, supra,* 200 S.C. 279, 20 S.E.2d 741.

In the case at bar, the Service became aware of the fraudulent conveyances and took steps to protect its interest. In the case at bar, the property in question is a lake lot on Lake Murray with a house on the lake lot. The property in 1991 through 1993 was worth between $22,000 (the 1985 purchase price) and the $110,000 (sale price on May 29, 1998). The property and improvements obviously increased in value between 1985 and 1993. Yet, the 1993 and 1994 conveyances are for ten dollars ($10) each. In other words, property then worth more than $22,000 was being sold for twenty dollars ($20) and during this time Roger and Margaret Davenport continued to reside on the property in question, albeit under the terms of a purported lease. *See* Audio Investment's memorandum in opposition (Document No. 91) to the government's motion for summary judgment, at pages 7–10. Indeed, under the case cited by the United States, *Higgins v. Smith, supra,* the Supreme Court of the United States noted that actual control over property, such as Roger Davenport's continued control over the property after September 23, 1993, can be taken into account by the Service:

On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property.

*Higgins v. Smith, supra,* 308 U.S. at 477–478, 60 S.Ct. 355.

At the time of the 1993 and 1994 conveyances, the Service was a creditor with respect to the federal income taxes due for Calendar Years 1991 and 1992. As a result, the 1993 and 1994 conveyances to Faith Davenport are void under the version of the Statute of Elizabeth then in effect in South Carolina.[10]

In turn, Faith Davenport's conveyance on June 10, 1996, to Audio Investments does not insulate or "legitimize" her conveyance to Audio Investments. The Service filed its Notice of Federal Tax Lien against Roger Davenport in Saluda County on March 22, 1996, two and a half months *before* Faith Davenport's purported conveyance of the property to Audio Investments.[11]

---

**10.** Had Roger Davenport and Margaret made such conveyances to Faith Davenport under normal circumstances (*i.e.,* if there had been no federal income tax arrearages for Roger Davenport and Margaret Davenport in 1993), bona fide conveyances might have had gift tax consequences. Although no gift tax would have been due, both Roger Davenport and Margaret Davenport would have likely "used up" portions of their unified credit (for estate and gift taxes) because the value of the property conveyed exceeded the annual gift tax exclusion of $10,000. Moreover, since both Roger Davenport and Margaret Davenport have continued to reside on the property, their remaining on the property constitutes a "retained life estate." A retained life estate would disqualify them from use of the $10,000 annual gift tax exclusion (which applies only to "present interests" in property).

**11.** The property in question is located in Saluda County, although it has a "Leesville" mailing address. The "Leesville" mailing address is, apparently, caused the Service to file the federal tax liens in Lexington County on October 22, 1995. In other words, the first tax liens were filed in the wrong county.

It is noteworthy that the contentions raised by Roger Davenport are being raised in the above-captioned case, which was filed *after* the Service assessed and collected the taxes due for Calendar Years 1991–1993. The above-captioned case is actually an attempt by Roger Davenport to effect an "end-run" against the Anti–Injunction Act. In other words, Roger Davenport, Margaret Davenport, Faith Davenport, and Audio Investments could not have stopped the assessment or collection of the taxes due when the Service was actually assessing and collecting the taxes.

■■■■ Closely on point are cases interpreting the Anti–Injunction Act and cases on the sovereign immunity of the United States. The United States cannot be sued without its express consent, and express consent is a prerequisite to a suit against the United States. *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). The bar of sovereign immunity cannot be avoided by naming officers or employees as defendants. *Gilbert v. Da Grossa,* 756 F.2d 1455, 1458 (9th Cir.1985). *Cf. Hawaii v. Gordon,* 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963). Similarly, the bar of sovereign immunity cannot be avoided by the filing of a suit against a federal agency or a federal department, such as the Internal Revenue Service. *See Campbell v. United States,* 496 F.Supp. 36, 37–38 n. * (E.D.Tenn.1980).

Title 26 U.S.C. (I.R.C.) § 7421(a) provides that, unless certain exceptions are applicable:

> [N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person[.]

The United States Court of Appeals for the Fourth Circuit has held that, if there is no express provision for an exception in the Anti–Injunction Act itself, a lower federal court may not create an exception. *See Clark v. Baker (In re Heritage Church and Missionary Fellowship),* 851 F.2d 104, 105–106 (4th Cir.1988)(the "PTL" bankruptcy case).[12]

The Supreme Court of the United States has indicated that the purpose of the Anti–

---

The former Town of Leesville (now part of Batesburg–Leesville) is located in Lexington County. But the "Leesville" mailing area includes western Lexington County and eastern Saluda County.

The confusion caused by a discrepancy between geographical location and mailing address is not limited to "Leesville." It can be judicially noticed that other portions of northeastern Saluda County have a "Prosperity" mailing address even though the Town of Prosperity is located in Newberry County.

In the Upstate, an analogous situation affects a prison. The Perry Correctional Institution is actually located in southern Greenville County but has a Pelzer mailing address. The Town of Pelzer is in Anderson County.

**12.** One distinguished commentator (now deceased) noted:

> Section 6213(a) is no mere technicality. Prior to establishment in the mid–1920's of the Board of Tax Appeals (now the Tax Court), one could litigate a tax assessment only by paying the tax and suing for a refund in a district court or the Court of Claims (now the U.S. Claims Court). With the advent of the Board of Tax Appeals, one could litigate without paying. The keystone of the new system was a restraint on assessment until the taxpayer's right to petition the Board was exercised or waived or lapsed, and, thereafter, if the right was exercised, while litigation was proceeding. Violation of the rule by the Service was made one of the few exceptions to the Anti–Injunction statute now found in section 7421. Taxpayers retain the right to pay the tax and litigate in a federal district court or the Claims Court, but, not surprisingly, the vast majority of litigated cases (80 to 90 percent) follow the Tax Court route.

Charles S. Lyon, *Disclosure of Grand Jury Materials: Why the Supreme Court Was Wrong in Baggot,* 39 Tax Law Review 215, 216–217 (1984).

Injunction Act is "the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, 'and to require that the legal right to the disputed sums be determined in suit for a refund.'" *Bob Jones University v. Simon,* 416 U.S. 725, 736, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974).[13] *See also Rochefort v. Gibbs,* 696 F.Supp. 1151, 1152–1153 (W.D.Mich.1988).

The Supreme Court of the United States has judicially created a limited exception to the Anti–Injunction Act. *See Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962).[14] In order to establish a claim for injunctive relief under the holding in *Enochs v. Williams Packing & Navigation Co.,* the taxpayer must show: *(1)* under the most liberal view of the applicable laws and facts, it is clear that the government cannot prevail on the merits; and *(2)* absent an injunction, irreparable injuries will occur for which there is no adequate remedy at law. 370 U.S. at 6–7, 82 S.Ct. 1125. Unless *both* of these prerequisites are met, "a suit for preventive injunctive relief must be dismissed." *United States v. American Friends Service Committee,* 419 U.S. 7, 10, 95 S.Ct. 13, 42 L.Ed.2d 7 (1974).

As to the second prerequisite, Roger Davenport had adequate remedies at law. All United States Court of Appeals have held that the right of a taxpayer to petition the Tax Court and his or her right, in the alternative, to pay the tax and then sue for a refund (in a federal district court) are adequate remedies at law. *See, e.g., Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 313–314 n. 1 (9th Cir.1982)(denying injunction,

even though the Service failed to mail notice of deficiency to the taxpayer's last known address, because the taxpayer did not establish that it had no adequate remedy at law, or that irreparable injury would result from the denial of the injunction). Roger Davenport could have petitioned the Tax Court. Roger Davenport could have filed timely federal income tax returns, paid his taxes, and then started administrative, and, if necessary, judicial proceedings in a federal district court to recover a refund.

Moreover, the Declaratory Judgment Act would not give Roger Davenport the protection of its provisions because there is an exception with "respect to Federal taxes." 28 U.S.C. § 2201(a). "The Declaratory Judgment Act's tax exception, and the Anti–Injunction Act, work together to insure that preemptive taxpayer litigation will not frustrate the efforts of the Internal Revenue Service (the "IRS") to assess and collect federal taxes." *Spencer v. Brady,* 700 F.Supp. 601, 602 (D.D.C. 1988). *See also American Society of Association Executives v. Bentsen,* 848 F.Supp. 245, 247–250 (D.D.C.1994).

The Anti–Injunction Act would not have allowed a federal district court to restrain the assessment or collection of the disputed taxes in this case—which obviously has been Roger Davenport's ultimate goal since 1992. Furthermore, Roger Davenport has not shown that any of the statutory or judicially created exceptions to the Anti–Injunction Act are applicable. Roger Davenport had adequate remedies at law, even though the documentary evidence

---

**13.** Portions of the Court's holding in *Bob Jones University v. Simon* were modified by *South Carolina v. Regan,* 465 U.S. 367, 372–382, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984).

**14.** The doctrine enunciated in *Enochs v. Williams Packing & Navigation Co.* was partially modified by *South Carolina v. Regan, supra,* 465 U.S. at 372–382, 104 S.Ct. 1107, which is cited in footnote 13, *supra.*

shows that he refused to avail himself of those remedies:

Under the second prong of the *Williams Packing* test, the plaintiffs must show that denial of an injunction will cause them irreparable harm and that they have no adequate remedy at law. *"Americans United"*, 416 U.S. at 762, 94 S.Ct. at 2059. Plaintiffs have not made such a showing. A plaintiff's First Amendment rights are not implicated by a Congressional requirement that its lobbying expenses may not be paid for in part by a tax subsidy. *See Taxation With Representation*, 461 U.S. at 550, 103 S.Ct. at 2003; *Cammarano v. U.S.*, 358 U.S. 498, 513, 79 S.Ct. 524, 533, 3 L.Ed.2d 462 (1959). In addition, the Supreme Court has stated that an anticipated reduction in income through contributions or dues pending the outcome of a refund suit does not suffice as irreparable injury under the *Williams Packing* analysis. *"Americans United"*, 416 U.S. at 761–763, 94 S.Ct. 2053.

The plaintiffs' complaint also fails to meet the second prong of the *Williams Packing* test because they have available alternative legal remedies. The plaintiffs have the opportunity to obtain appropriate judicial review of their claims. First, if they elect not to pay the applicable taxes, the plaintiffs, as individual taxpayers, may challenge the requirements of sections 162(e) and 6033(e) by bringing a subsequent suit in the United States Tax Court challenging any tax delinquency with which they may be assessed. *See* 26 U.S.C. § 6213. Second, the plaintiffs may elect to pay the taxes then bring a tax refund action in the United States District Court or the United States Court of Federal Claims. *See* 26 U.S.C. § 7422.

Plaintiffs assert that they have no alternative remedy to challenge the notification provisions of section 6033(e)(1)(A)(ii) because if the associations comply, their members will have no legal remedy. As was represented to the Court during the hearing on this motion, the associations could refuse to notify their members which would result in a proxy tax liability. At that point, the plaintiffs could obtain a judicial hearing before the Tax Court, the district courts or the Court of Federal Claims. "A taxpayer cannot render an available review procedure an inadequate remedy at law by voluntarily forgoing it." *"Americans United"*, 416 U.S. at 762 n. 13, 94 S.Ct. at 2059 n. 13.

*American Society of Association Executives v. Bentsen, supra,* 848 F.Supp. at 249–250.

In cases filed by tax protesters against the Internal Revenue Service, employees or officials, federal courts have rejected similar contentions raised by Roger Davenport in the case at bar. *See, e.g., Stonecipher v. Bray,* 653 F.2d 398 (9th Cir. 1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982); and *Wise v. Commissioner of I.R.S.,* 624 F.Supp. 1124 (D.Mont.1986). Also, the characterization of this case as a civil action and its being filed originally in state court would not defeat the applicability of the Anti–Injunction Act. *See Sato v. Peterson,* 1995 U.S.Dist. LEXIS® 10093, *21–*25 (N.D.Ill., July 18, 1995)(magistrate judge's Report and Recommendation), *adopted,* 1995 WESTLAW® 591460, 1995 WL 591460 (N.D.Ill., October 4, 1995).

Significantly, neither Roger Davenport nor Audio Investments sought to utilize the six-month redemption period set forth in 26 U.S.C. (I.R.C.) §§ 6337–6339, which commenced on May 29, 1999. The applicable statute, 26 U.S.C. § 6337, makes the following provisions for redemption of real estate after sale:

(b) Redemption of real estate after sale.—

(1) Period.—The owners of any real property sold as provided in section 6335, their heirs, executors, or administrators, or any person having any interest therein, or a lien thereon, or any person in their behalf, shall be permitted to redeem the property sold, or any particular tract of such property, at any time within 180 days after the sale thereof.

26 U.S.C. (I.R.C.) § 6337.

Moreover, Roger Davenport and Audio Investments cannot use 26 U.S.C. (I.R.C.) § 7433 to challenge the assessment of federal income taxes. *See Granse v. United States,* 932 F.Supp. 1162 (D.Minn.1996), *affirmed, Granse v. U.S. Department of the Treasury,* 1997 WL 215330, 112 F.3d 513 (8th Cir.1997), which concerned a tax protester's attempt to challenge the sale of real estate:

Plaintiff Karl G. Granse ("Granse") commenced this nominal "quiet title" action challenging the United States Internal Revenue Service's ("IRS") tax jeopardy assessment, levy, and public sale of property located at 105 East 151st Street, Burnsville, Minnesota (the "Property") following Granse's failure to pay delinquent federal taxes owing for the period 1988 through 1993. Granse seeks an order declaring the United States' "claims" to the Property invalid, declaring the seizure and subsequent sale of the property void, enjoining Defendant Park Drive Partnership ("Park Drive") from receiving title to the Property, and declaring Granse owner of the Property in fee simple absolute. Currently before the Court are the Defendants' ... motions to dismiss or for summary judgment. * * * For the reasons set forth below, the Court will grant the Defendants' motions.

Background

Granse did not pay his federal income taxes for the period 1988 through 1993. This is Granse's second judicial challenge to the IRS's collection of these delinquent taxes. The IRS first made a jeopardy assessment against Granse on November 23, 1994, pursuant to 26 U.S.C. § 6861(a) [FN3] in the amount of $86,621.00. (Compl. Ex. C–1; Mecham Decl. ¶ 3, attach. as Gov't Ex. 1.) On December 19, 1994, the IRS levied upon the Property in order to satisfy the assessment. (*Id.* ¶ 6.) The IRS sent Granse notice of the levy and seizure on this same date. (McKinney Decl. ¶ 9; attach. as Gov't Ex. 2.)

[FN3. Section 6861(a) provides that "[i]f the Secretary believes that the assessment or collection of a deficiency ... will be jeopardized by delay, he shall ... immediately assess such deficiency ..., and notice and demand shall be made by the Secretary for the payment thereof."]

On January 4, 1995, Granse commenced the first civil action in this Court seeking judicial review of the IRS's jeopardy assessment and an order enjoining collection or sale of the Property. The Court dismissed Granse's complaint, concluding that the IRS's decision to impose a jeopardy assessment and the amount of the jeopardy assessment were both "reasonable" as required by 26 U.S.C. § 7429(g). *See Granse v. United States,* 892 F.Supp. 219 (D.Minn.1995).

Following this Court's March 21, 1995 Order, the IRS scheduled a public sale of the Property pursuant to 26 U.S.C. § 6335. The sale was set to take place on May 11, 1995. Three days before the scheduled sale, Granse filed a petition in the United States Bankruptcy Court seeking to delay the sale under Chapter 13 of the United States Bankruptcy

Code. Pursuant to an "automatic stay" provision in the Bankruptcy Code, 11 U.S.C. § 362, the IRS canceled the May 11 sale.

On June 12, 1995, the Bankruptcy Court lifted its stay as to the IRS in order to facilitate the sale of the Property. (Compl.¶ V.) The IRS subsequently conducted a public sale and sold the property to Defendant Park Drive. (*Id.;* McKinney Decl. ¶ 19, attach. as Gov't Ex. 2.) Upon payment, the IRS issued a "certificate of sale" to Park Drive as provided for under 26 U.S.C. § 6338(a). The certificate of sale was recorded in the Dakota County Recorder's office on November 8, 1995, and the proceeds of the sale were applied to offset Granse's delinquent tax liabilities for the years 1985–1993. (Compl. ¶ V; McKinney Decl. ¶ 21, attach. as Gov't Ex. 2.) The IRS District Director issued a quitclaim deed to Park Drive on January 10, 1996. (McKinney Decl., Ex. 2–F, attach. as Gov't Ex. 2.)

Granse commenced this second action on January 3, 1996. He currently claims that the jeopardy assessment was unlawful, that the IRS had no authority to levy on the Property, and that the sale did not comply with statutory requirements. Granse further claims the IRS violated his "due process right to appeal" under the Administrative Procedures Act, 5 U.S.C. § 702 *et seq.* because it did not respond to a "protest" he filed with the IRS opposing its initial jeopardy assessment or his request for the "taxing statute" upon which the IRS's tax assessments were based.

The IRS and Park Drive have moved to dismiss this action or for summary judgment. The IRS claims (1) this Court does not have subject matter jurisdiction over this action and that it should accordingly be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure. The IRS and Park Drive also claim (2) the tax assessment and levy procedures at issue were legal and conveyed full title to the Property to Park Drive.

### Discussion

#### I. Jurisdiction

Granse alleges jurisdiction over this action under 28 U.S.C. §§ 1331, 1361, 1340, and 2410; 26 U.S.C. § 7433 and 5 U.S.C. § 702. The IRS argues that these statutes do not provide jurisdiction and that the Federal Defendants, as sovereign, are immune from the present suit. The IRS's argument is predicated on a fundamental principle of law which Granse has ignored: the United States is immune from suit except to the extent the Congress has expressly waived that immunity. *See United States Dept. of Energy v. Ohio*, 503 U.S. 607, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992). That principle, together with the limitations on federal court jurisdiction, dispose of the vast majority of issues in this case.

At the outset, and separate and apart from the jurisdictional statutes discussed below, the Court finds no jurisdictional basis for granting the declaratory relief Granse seeks in his Complaint. The law in this area is unequivocal. Congress has specifically provided that, subject to limited exceptions not applicable here, federal courts do not have jurisdiction to grant declaratory relief in cases involving federal taxes. 28 U.S.C. § 2201(a). Thus the remainder of this discussion is limited to Granse's request to quiet title in his name, to set aside seizure and sale of the Property, and for damages.

#### A. *28 U.S.C. § 1331, 1340 and 1361*

Sections 1331, 1340, and 1361 of Title 28 do not waive the federal govern-

ment's sovereign immunity for suit challenging an administrative tax levy. *See Fostvedt v. United States*, 978 F.2d 1201, 1203 (10th Cir.1992), *cert. denied,* 507 U.S. 988, 113 S.Ct. 1589, 123 L.Ed.2d 155 (1993). As the Ninth Circuit recently recognized in a similar case, "a mere assertion that general jurisdictional statutes apply" "cannot waive the government's sovereign immunity." *Hughes v. United States*, 953 F.2d 531, 539 n. 5 (9th Cir.1992) (citing *Lonsdale v. United States*, 919 F.2d 1440, 1443–44 (10th Cir. 1990); *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir.1985)). Thus these general jurisdictional statutes do not provide a basis for an action against the IRS here.

### B. 26 U.S.C. § 7433

Section 7433 similarly does not provide jurisdiction in this case. This section provides that:

If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the Internal Revenue Service recklessly or intentionally disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

26 U.S.C. § 7433. This section does not provide jurisdiction for improper *assessment* of taxes. *Miller v. United States*, 66 F.3d 220, 223 (9th Cir.1995), *cert. denied,* 517 U.S. 1103, 116 S.Ct. 1317, 134 L.Ed.2d 471 (1996). It provides jurisdiction only for improper col-

lection activities. *Id.* In the present case, it is clear Granse's Complaint is directed primarily to contesting the *assessment* of his taxes. Second, to the extent Granse's claim is based on the IRS's *collection* activities, Granse is specifically precluded from obtaining recovery because he has not contested the procedures with the IRS by filing an administrative action for a refund. Section 7422 explicitly provides:

(a) No suit prior to filing claim for refund.—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary....

26 U.S.C. § 7422. As a result, Granse's claims, insofar as they seek damages for the alleged improper assessment and collection procedures employed under § 7422, must be dismissed. *Granse v. United States, supra,* 932 F.Supp. at 1164–1167.

Hence, since Roger Davenport and Audio Investments did not seek to redeem the property under 26 U.S.C. § 6337–6339 during the automatic six-month period following the sale, their claims fail in the above-captioned case. Moreover, there is no indication that Roger Davenport ever timely filed an administrative claim for a refund as to the monies collected by virtue of the sale of the property.[15]

**15.** Roger Davenport and Audio Investments could have had a third-party redeem the property. *See Babb v. Lindvig,* 947 F.Supp. 405 (W.D.Wis.1996), where the Service sold property for unpaid taxes. In *Babb v. Lindvig,* the taxpayer executed a power of attorney

on behalf of a relative. The relative tender a check plus 20% interest to the Service during the statutory redemption period. The court in *Babb v. Lindvig* held that the redemption by the relative was proper and declined to

The failure of Roger Davenport, other Davenport family members, and Audio Investments to redeem the property within the six month period caused title to pass to Dewey Robertson, Sr., on December 7, 1998. *Babb v. Lindvig,* 947 F.Supp. 405, 409 (W.D.Wis.1996)("Section 6338 does not vest title in the tax sale purchaser until the period of redemption has expired; therefore redemption does not take title away from the tax sale purchaser."). Indeed, Section 6339(b)(2) states explicitly that a deed operates as "a conveyance of all the right, title, and interest the party delinquent had in and to the real property thus sold at the time the lien of the United States attached thereto." In other words, the issuance of the deed on December 7, 1998, by the Service conveyed title in the property in question to Dewey Robertson, Sr. *See Babb v. Lindvig, supra,* 947 F.Supp. at 408–410; and 26 U.S.C. (I.R.C.) § 6339, which specifically provides:

§ 6339. Legal effect of certificate of sale of personal property and deed of real property

(b) Deed of real property.—In the case of the sale of real property pursuant to section 6335—

(1) Deed as evidence.—The deed of sale given pursuant to section 6338 shall be prima facie evidence of the facts therein stated; and

(2) Deed as conveyance of title.—If the proceedings of the Secretary as set forth have been substantially in accordance with the provisions of law, such deed shall be considered and operate as a conveyance of all the right, title, and interest the party delinquent had in and to the real property thus sold at the time the lien of the United States attached thereto.

(c) Effect of junior encumbrances.—A certificate of sale of personal property given or a deed to real property executed pursuant to section 6338 shall discharge such property from all liens, encumbrances, and titles over which the lien of the United States with respect to which the levy was made had priority.

(d) Cross references.—

(1) For distribution of surplus proceeds, see section 6342(b).

(2) For judicial procedure with respect to surplus proceeds, see section 7426(a)(2).

26 U.S.C. § 6339.

In short, despite the tax protester activities of Roger Davenport and the assistance provided to Roger Davenport by Faith Davenport and Audio Investments, the property in question still could have been redeemed for payment of the taxes plus interest during the six months after the tax sale. *Babb v. Lindvig, supra.* The issuance of the deed by the Service on December 7, 1998, passed title to Dewey Robertson, Sr. As a result, Roger Davenport, Margaret Davenport, Faith Davenport, and Audio Investments are entitled to any relief regarding the sale of the property in question. *Traver v. Weisberg,* 1994 WL 578467 (D.Or., October 18, 1994)(denying relief similar to that requested by Audio Investments and Roger Davenport in this case), *appeal dismissed, in part,* 73 F.3d 370 (9th Cir.1995), *summary judgment granted, Traver v. United States,* 79 A.F.T.R.2d 97-1697 (D.Ore. 1997).

In light of the availability of the redemption process, Roger Davenport's medical exhibits concerning his prostate cancer in 1993 provide no basis for relief in the above-captioned case. Roger Davenport's prostate cancer did not prevent him from

give title to the purchaser of the property at the tax sale.

executing the deed of September 23, 1993, to Faith Davenport. Roger Davenport's "'prostate cancer' defense" appears to be premised on an invalid deduction of fact, which is best articulated in the maxim "*Post hoc, ergo propter hoc.*" This maxim is usually translated as "After this, therefore, on account of this." Most federal courts have rejected the validity of that maxim in determining whether a causal connection exists. *See, e.g.,* the order of the Honorable Charles E. Simons, Jr., United States District Judge, in *Orr v. Gardner,* 261 F.Supp. 39, 41 n. 1 (D.S.C. 1966)("*Post hoc, ergo propter hoc* in logic is usually intended as 'the fallacy of arguing from mere temporal sequence to cause and effect relationship.'"); and *Loyd v. Bullhead City,* 1991 WL 70735, *6, 931 F.2d 897 (9th Cir.1991), where the United States Court of Appeals for the Ninth Circuit commented: "Loyd's argument presents a classic example of the logical fallacy known as *post hoc, ergo propter hoc, i.e.,* that a cause-and-effect relationship can be shown from a mere temporal sequence." Although a district court, when evaluating a pleading under 28 U.S.C. § 1915, must assume that the allegations in the pleading are true, a district court is not required to accept unwarranted deductions of fact. *See Gersten v. Rundle,* 833 F.Supp. 906, 910 (S.D.Fla.1993); and *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754–755 (9th Cir.1994)(district court not required to accept conclusions that cannot be reasonably drawn from facts alleged). *See also Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987)(district court "not required to 'accept as true legal conclusions or unwarranted factual inferences'"); *Bender v. Suburban Hospital, Inc.,* 159 F.3d 186, 192 (4th Cir.1998); and *cf. Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.").

In his affidavit (Document No. 92), Roger Davenport appears to be contending that the undersigned United States Magistrate Judge has no jurisdiction over this matter. Under the Local Civil Rules of this district court, *pro se* cases are referred to a United States Magistrate Judge. *See* Local Civil Rule 73.02(b)(2)(e). Moreover, as pointed out on the last page of this Report and Recommendation, the final decision in this matter will be made by a United States District Judge. *See Mathews v. Weber,* 423 U.S. 261, 270–271, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976); and *Estrada v. Witkowski,* 816 F.Supp. 408, 410 (D.S.C.1993).

Roger Davenport even contends, in his affidavit filed on January 23, 2002 (Document No. 93), that the United States District Court for the District of South Carolina lacks jurisdiction over this case. Section § 1346 of Title 28, United States Code, specifically, gives the federal district courts jurisdiction over cases where the United States is a defendant. Moreover, the above-captioned case is also clearly within the scope of 28 U.S.C. § 1346(a)(1).

Roger Davenport's reliance on *Jack Cole Co. v. MacFarland,* 206 Tenn. 694, 10 McCanless 694, 337 S.W.2d 453 (1960), is misplaced. *See* Roger Davenport's Affidavit (Document No. 84). At the time *Jack Cole Co. v. MacFarland* was decided, Tennessee's Constitution prohibited a tax on income. *See* "old" Article II, Section 28 of the Constitution of Tennessee, which was amended in 1973. Secondly, *Jack Cole Co. v. MacFarland* is not relevant on the issue of federal income taxes.

Roger Davenport's attention is directed to 26 U.S.C. (I.R.C.) § 61. *See also Unit-*

*ed States v. Koliboski,* 732 F.2d 1328 (7th Cir.1984):

> Although not raised in his brief on appeal, the defendant's entire case at trial rested on his claim that he in good faith believed that wages are not income for taxation purposes. Whatever his mental state, he, of course, was wrong, as all of us already are aware. Nonetheless, the defendant still insists that no case holds that wages are income. Let us now put that to rest: **WAGES ARE INCOME.** Any reading of tax cases by would-be tax protesters now should preclude a claim of good-faith belief that wages—or salaries—are not taxable.

*United States v. Koliboski, supra,* 732 F.2d at 1330 n. 1. Hence, it was not necessary for the Service to respond to Roger Davenport's delaying tactics, which are mentioned on page 2 of his affidavit (Document No. 84), "for information establishing him [Roger Davenport] liable under the Law." *See also* Roger Davenport's affidavit filed on January 23, 2002 (Document No. 93), wherein he describes himself as a person "who at the time of ownership transfer [6] was not liable for any income taxes[.]" · (Document No. 93, at page 3).

Roger Davenport, according to Government's Exhibit 1 (to Document No. 79), had the following amounts of adjusted gross income over the tax years in question:

| Tax Year | Adjusted Gross Income |
|----------|----------------------|
| 1991 | $122,602.00 |
| 1992 | $127,384.00 |
| 1993 | $ 54,077.00 |

It strains credulity to believe that an individual (or couple) with adjusted gross income exceeding $100,000.00 would not owe any federal income tax. *Gersten v. Rundle, supra,* 833 F.Supp. at 910 (although a district court, when evaluating a pleading under 28 U.S.C. § 1915, must assume that the allegations in the pleading are true, a district court is not required to accept unwarranted deductions of fact).

The undersigned does not agree with the Service's characterization of Audio Investments as Roger Davenport's alter ago. This conclusion, however, is not fatal to the United States' motion for summary judgment because the fraudulent conveyances to Faith Davenport in 1993 and 1994 are the dispositive transactions at issue, not the 1996 conveyance to Audio Investments. In any event, Audio Investments is a sham trust. *William L. Comer Family Equity Trust v. United States, supra.* Moreover, the 1993 and 1994 conveyances to Faith Davenport are in Audio Investments' purported chain of title.

Roger Davenport and Margaret Davenport's failure to file timely tax returns precludes them from use of the transferee "safe harbors" set forth in 26 U.S.C. § 6901, which provides:

§ 6901. Transferred assets

(a) Method of collection.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) Income, estate, and gift taxes.—

(A) Transferees.—The liability, at law or in equity, of a transferee of property—

(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

(ii) of a decedent in the case of a tax imposed by chapter 11 (relating to estate taxes), or

(iii) of a donor in the case of a tax imposed by chapter 12 (relating to gift taxes),

in respect of the tax imposed by subtitle A or B.

(B) Fiduciaries.—The liability of a fiduciary under section 3713(b) of title 31, United States Code * * * in respect of the payment of any tax described in subparagraph (A) from the estate of the taxpayer, the decedent, or the donor, as the case may be.

(2) Other taxes.—The liability, at law or in equity of a transferee of property of any person liable in respect of any tax imposed by this title (other than a tax imposed by subtitle A or B), but only if such liability arises on the liquidation of a partnership or corporation, or on a reorganization within the meaning of section 368(a).

(b) Liability.—Any liability referred to in subsection (a) may be either as to the amount of tax shown on a return or as to any deficiency or underpayment of any tax.

(c) Period of limitations.—The period of limitations for assessment of any such liability of a transferee or a fiduciary shall be as follows:

(1) Initial transferee.—In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor;

(2) Transferee of transferee.—In the case of the liability of a transferee of a transferee, within 1 year after the expiration of the period of limitation for assessment against the preceding transferee, but not more than 3 years after the expiration of the period of limitation for assessment against the initial transferor;

except that if, before the expiration of the period of limitation for the assessment of the liability of the transferee, a court proceeding for the collection of the tax or liability in respect thereof has been begun against the initial transferor or the last preceding transferee, respectively, then the period of limitation for assessment of the liability of the transferee shall expire 1 year after the return of execution in the court proceeding.

(3) Fiduciary.—In the case of the liability of a fiduciary, not later than 1 year after the liability arises or not later than the expiration of the period for collection of the tax in respect of which such liability arises, whichever is the later.

\*    \*    \*    \*    \*    \*

(g) Address for notice of liability.—In the absence of notice to the Secretary under section 6903 of the existence of a fiduciary relationship, any notice of liability enforceable under this section required to be mailed to such person, shall, if mailed to the person subject to the liability at his last known address, be sufficient for purposes of this title, even if such person is deceased, or is under a legal disability, or, in the case of a corporation, has terminated its existence.

(h) Definition of transferee.—As used in this section, the term "transferee" includes donee, heir, legatee, devisee, and distributee, and with respect to estate taxes, also includes any person who, under section 6324(a)(2), is personally liable for any part of such tax.

26 U.S.C. § 6901.

The failure to file tax returns by Roger Davenport and Margaret Davenport (irrespective of whether Margaret Davenport was required to file an income tax return) disqualifies them from the "safe harbors" of 26 U.S.C. § 6901 because the commencement of the limitations period is triggered by the filing of a return. In

other words, the "safe harbor" for a transferee of a transferee set forth in 26 U.S.C. § 6901(c)(2) is not available to Audio Investments because the limitations period never began to run as to Roger Davenport and Margaret Davenport by virtue of their failure to file federal income tax returns for 1991, 1992, and 1993. *See* 26 U.S.C. (I.R.C.) § 6501(c)(3)("In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time."). Also, the substitute returns made by the Service under 26 U.S.C. § 6020(b) did not cause the limitations period to begin running. *See* 26 U.S.C. § 6501(b)(3). Moreover, it is well settled that "[s]ervice of notice of levy need not be made upon potential third party owners of levied-upon property to satisfy the notice provisions of the federal tax law." *William L. Comer Family Equity Trust v. United States, supra,* 732 F.Supp. at 760, *citing Douglas v. United States,* 562 F.Supp. 593 (S.D.Ga.1983).

It is not clear from the record why Audio Investments and Margaret Davenport did not commence an action under 26 U.S.C. (I.R.C.) § 7426, which provides:

§ 7426. Civil actions by persons other than taxpayers

(a) Actions permitted.—

(1) Wrongful levy.—If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary.

26 U.S.C. § 7426(a)(1). Federal district courts have jurisdiction over such cases. *New Fairview, Inc. v. United States,* 2001 WL 953799 (D.Mass., May 9, 2001).

Suits under 26 U.S.C. § 7426, however, are subject to a nine-month limitations period. *See* 26 U.S.C. (I.R.C.) § 6532(c):

(c) Suits by persons other than taxpayers.—

(1) General rule.—Except as provided by paragraph (2), no suit or proceeding under section 7426 shall be begun after the expiration of 9 months from the date of the levy or agreement giving rise to such action.

(2) Period when claim is filed.—If a request is made for the return of property described in section 6343(b), the 9–month period prescribed in paragraph (1) shall be extended for a period of 12 months from the date of filing of such request or for a period of 6 months from the date of mailing by registered or certified mail by the Secretary to the person making such request of a notice of disallowance of the part of the request to which the action relates, whichever is shorter.

26 U.S.C. § 6532(c).

■ Since the record shows no formal request by Margaret Davenport or Audio Investments under 26 U.S.C. (I.R.C.) § 6343(b),[16] the nine-month limitations pe-

---

**16.** *See BSC Term of Years Trust v. United States,* 2000 WL 33155870 (W.D.Texas, Dec. 28, 2000), for how a third-party can properly invoke 26 U.S.C. § 6343(b):

Section 6532(c) provides for two separate limitations periods, depending on whether a potential litigant makes a proper written request for return of the property levied upon. *See* I.R.C. § 6532(c). The general

rule is that a section 7426 claim must be filed within nine months from the date of the levy. *See* I.R.C. § 6532(c)(1); 26 C.F.R. § 301.6532–3(a) (2000). But if an entity makes a proper written request for return of the property, the filing period is extended for a period of twelve months from the date the request was filed or six months from the date the IRS denies the request, whichever is shorter. *See* I.R.C. § 6532(c)(2); 26 C.F.R. § 301.6532–3(b).

Here, the IRS levied on the Plaintiffs' Chase Bank account on September 10, 1999. Plaintiffs filed this suit on September 7, 2000, almost one year after the date of the levy. Consequently, Plaintiffs' section 7426 claim is untimely unless they extended the limitations period by making a proper written request for return of the property under section 6532(c)(2). *See Amwest Sur.* v. *U.S.*, 28 F.3d 690, 694–95. Plaintiffs contend that the courtesy copy of their letter to John Wood, incorrectly addressed to the IRS District Director, constitutes a proper request for return of their property under section 6532(c)(2). The Court disagrees.

In order for Plaintiffs' letter to pass muster under section 6532(c)(2), it must *strictly* comply with the requirements set out in 26 C.F.R. § 301.6343–2(b). [FN2] *See* 26 C.F.R. § 301.6343–2(c); *Amwest Sur.*, 28 F.3d at 695–97; *Winebrenner v. United States*, 924 F.2d 851, 856 (9th Cir.1991); *LaBonte v. United States*, No. 99–C–1129, 2000 WL 1203514, at *1 (E.D.Wis. Jan. 18, 2000); *Edwards Mach. Prods. Co. v. United States*, Civ., A. No. 94–1254MAC(DF), 1994 WL 757526, at *2 (M.D.Ga. Oct. 31, 1994). Plaintiffs' letter fails to meet these requirements.

[FN2. *"Request for return of property.* A written request for the return of property wrongfully levied upon must be addressed to the district director (marked for the attention of the Chief, Special Procedures Staff) for the Internal Revenue district in which the levy was made. The written request must contain the following information-

(1) The name and address of the person submitting the request;

(2) A detailed description of the property levied upon;

(3) A description of the claimant's basis for claiming an interest in the property levied upon; and

(4) The name and address of the taxpayer, the originating Internal Revenue district, and the date of the levy as shown on the notice of levy form, or levy form, or, in lieu thereof, a statement of the reasons why such information cannot be furnished." 26 C.F.R. § 301.6343–2(b).]

Plaintiffs' letter was not properly addressed to the district director of the internal revenue district in which the levy was made. *See* 26 C.F.R. § 301.6343–2(b). Plaintiffs sent a courtesy copy of their letter to "District Director, Department of the Treasury, Internal Revenue Service, Austin, Texas 73301." But the correct address for the IRS District Director is "300 E. Eighth Street, Austin, Texas 78701." Consequently, Plaintiffs' letter failed to strictly meet the requirements of 26 C.F.R. § 301.6343–2(b) and, therefore, did not constitute a written request for return of the property under section 6532(c)(2). *Cf. Amwest Sur.*, 28 F.3d at 696 (holding that letters to the plaintiff's revenue agent requesting return of the property did not satisfy the requirement that plaintiff send the request to the district director); *LaBonte*, 2000 WL 1203514, at *1 (same); *Fanning v. United States*, No. 1:95–CV–222–RCF, 1996 WL 343462, at *2–3 (N.D.Ga. Apr. 30, 1996) (holding that request for return of the property addressed to district director but never delivered by United Parcel Service did not satisfy the requirement that plaintiff send the request to the district director).

Further, the Government offers competent summary judgment evidence that the District Director never had actual knowledge of Plaintiffs' letter. In *Amwest Surety*, the Seventh Circuit suggested that it might have held the plaintiff's letter sufficient if the district director had actual knowledge of that letter. *See Amwest Sur.*, 28 F.3d at 697–98; *Small and Small, P.A. v. United States*, 1995 WL 674996, at *1–2 (S.D.Fla. Nov. 3, 1995). Here, the Government demonstrates that the IRS District Director did not have actual knowledge of Plaintiffs' letter. Accordingly, Plaintiffs cannot show any circumstances that would potentially excuse their failure to strictly comply with the requirements of 26 C.F.R. § 301.6343–2(b).

Because Plaintiffs' letter did not extend the limitations period under, section 6532(c)(2), their section 7426 claim is barred by section 6532(c)(1). Accordingly, the Court must dismiss Plaintiffs' suit for lack of subject matter jurisdiction. *See Towe Farms, Inc. v. I.R.S.*, Civ. A. No. H–

riod was not extended. The levy took place on February 9, 1998, and the seizure occurred on March 16, 1998. Audio Investments and Margaret Davenport had until November 9, 1998, to bring suit under 26 U.S.C. § 7426. Courts have held that the nine-month limitations period in 26 U.S.C. § 6532(c) is jurisdictional. *See Becton Dickinson and Company v. Wolckenhauer*, 215 F.3d 340, 343–354 (3rd Cir. 2000), *cert. denied, Becton Dickinson and Co. v. Internal Revenue Service*, 531 U.S. 1071, 121 S.Ct. 761, 148 L.Ed.2d 663 (2001). *See also BSC Term of Years Trust v. United States*, 2000 WL 33155870 (W.D.Texas, December 28, 2000)(untimely suits by family trusts).

As a result, notwithstanding the matter mentioned in footnote 7 of this Report and Recommendation, Margaret Davenport's failure to bring suit within nine months of February 9, 1998, precludes her from obtaining title to her former half-interest in the property in this civil action. *Becton Dickinson and Company v. Wolckenhauer, supra,* 215 F.3d at 343–354.[17]

93–3318, 1994 WL 739448, at *2 (S.D.Tex. Aug.24, 1994).

**17.** If the Service had based its tax liability for Roger Davenport on the basis of a married filing separately status, Margaret Davenport's assets, presumably, would not have been affected. *See* footnote 8 of this Report and Recommendation, *supra.* Indeed, there is nothing in the case record to suggest that Margaret Davenport is a tax protester.

Had Margaret Davenport not made the conveyance of March 28, 1994, to Faith Davenport, she would have certainly been entitled to cotenant protection under 26 U.S.C. § 7403. Moreover, even if one were to assume that Margaret Davenport retained title to her half-interest in the property (because the March 28, 1994, conveyance violated the Statute of Elizabeth), the limitations periods of 26 U.S.C. § 6532 bar any action by Mrs. Davenport for the levy on February 9, 1998, on what had been her half-interest in the property. *I.e.,* had Margaret Davenport time-

*Recommendation*

Accordingly, **I recommend that the District Court grant the Motion for Summary Judgment filed by the United States (Document No. 76–1) and issue a finding that the title to the property in question passed to Dewey Robertson, Sr., on December 7, 1998, under 26 U.S.C. (I.R.C.) § 6339.** It is also recommended that the following motions—the USA's Motion, in Alternative, to Dismiss (Document No. 76–2), Audio Investments' Motion for Partial Summary Judgment (Document No. 70), Audio Investments' Motion to Remand to State Court (Document No. 16), Roger Davenport's Motion to Remand to State Court (Document No. 19), Audio Investments' Motion to Certify Question (Document No. 56), and Audio Investments' Motion to Deny Claim of Privilege (Document No. 58)—be denied.

In light of the nationwide increase in tax protester activities and the likelihood that similar cases may arise in other federal judicial districts, it is also recommended that the District Court, in its discretion, consider publishing, in *Federal Rules De-*

ly commenced suit under 26 U.S.C. § 7426(a)(1), it is likely that Margaret Davenport would have prevailed with respect to her former half-interest in the property.

Yet, no action was taken by Margaret Davenport (who, in any event, is not a party to Civil Action No. 8:00–2847–20BG) during the nine-month period prescribed by 26 U.S.C. § 6532(c). The United States Court of Appeals for the Fifth Circuit has commented on the purpose and effect of statutes of limitations:

* * * Limitations statutes, however, are not cadenced to paper tidiness and litigant convenience. Time dulls memories, evidence and testimony become unavailable, and death ultimately comes to the assertions of rights as it does to all things human.

*United States v. Newman*, 405 F.2d 189, 200 (5th Cir.1968) (citation omitted from quotation).

*cisions,* its Order of August 27, 2001 (Document No. 20 in this case file), wherein it denied the motion to appear *pro hac vice* by Milton H. Baxley, II. Thereby, other federal district courts may be apprised of tax protester litigation in the District of South Carolina. The parties' attention is directed to the notice on the next page.

January 25, 2002.